May it please the Court, I'm Sarah Pelliquin of Federal Defenders of San Diego. On behalf of the appellant, Mr. Kelly-Palmer, I'll try to keep my eye on the clock. I'd like to reserve three minutes for rebuttal. You have a little fire in your voice. Speak up. Are we scary? No, Your Honor. Okay. The District Court violated Mr. Kelly-Palmer's Fifth and Sixth Amendment rights when it excluded the most important part of his testimony, simply because the Court didn't believe him. The only contested issue at trial was the element of alienage, and the jury did not get to hear the single most important evidence that was offered in Mr. Kelly-Palmer's defense. The District Court excluded that evidence basically because it determined that Mr. Kelly-Palmer's grandfather didn't exist, had never told Mr. Kelly-Palmer that he was born in National City, and then the Court proceeded to erroneously interpret the hearsay rules, which deprived Mr. Kelly-Palmer of his constitutional rights. What the Court did was apply a per se rule disqualifying Mr. Kelly-Palmer as the defendant from testifying regarding his grandfather's statements about his place of birth, and this violated Rock v. Arkansas. The Court also added an independent corroboration requirement to the hearsay rules, which don't exist. Talk slower, huh? Sorry. Talk slower and project your voice. Yes, Your Honor. The Court also made a credibility determination about Mr. Kelly-Palmer, which was solely the province of the jury to make. Mr. Kelly-Palmer's testimony ---- You see, you dropped your sentences. Maybe I'm getting deaf, but ---- I'm sorry, Your Honor. I'll sit closer to the mic. There's a tendency in young people today to speak very, very fast, you know, and maybe it's the music they listen to. Lincoln didn't speak rapidly, see? Churchill didn't speak rapidly. Roosevelt enunciated every word. It's important. That's what you've got to do. Okay. Would you like me to repeat myself slower? I'm going to. The best teacher I ever had was my high school public speaking teacher, and she's watching everyone here. So just relax, be conversational, and just tell us from your heart what the problem here is. I mean, he wanted to ---- He was going to testify that his grandfather told him he was born in National City. That's a rough place, isn't it? Is it? I don't know if National City is a rough place, but ---- It used to be when I was down there, but I left, so it's probably okay now. All right. So that's ---- And your argument is that that information, though it's hearsay, should have been admitted. That's correct, Your Honor. And the jury would decide whether to ---- what way to give it. Exactly. And in this case, what the district court did was make that determination in advance. The district court in advance determined that Mr. Kelly Palmer wasn't credible and that the testimony that he was offering wasn't credible, and on that basis, the district court excluded his testimony, and the jury never got to hear it. Mr. Kelly Palmer's defense at trial was that he was not an alien or that at least there was a reasonable doubt about his alienage. And the most important evidence, the heart of his defense, was that his grandfather had told him that he was born in National City, and that hearsay statement was admissible under two separate provisions of the Federal Rules of Evidence. It was admissible under 803.19 as reputation evidence about his personal history or family facts, including his birth. It was the statement of his biological grandfather, Hoppe Kelly, who is a person who is likely to have heard the reputation within his family for Mr. Kelly Palmer's place of birth. And one can infer that Hoppe Kelly, the grandfather, heard this from people who had personal knowledge. Mr. Kelly Palmer was born sometime ‑‑ How could you make that inference? Say that again. What was the inference the jury could draw from that statement? Well, in discussing the sort of the preliminary facts, whether this was reputation evidence, because Hoppe Kelly is Mr. Kelly Palmer's grandfather, I think it would be unlikely that Hoppe Kelly was actually in the delivery room the day that Mr. Kelly Palmer was born. Because of the nature of the relationship between Hoppe Kelly and Mr. Kelly Palmer, it seems likely that he would have actually heard that fact from his son and from Mr. Kelly Palmer's parents. So I think this is squarely reputation evidence. It's reputation within the family. It's something that's been discussed, something that Mr. ‑‑ or that Hoppe Kelly knew through his discussions with his son and his daughter‑in‑law, and that he then conveyed to Mr. Kelly Palmer. They're in the correct community. And the 80319, the advisory committee notes, are very clear that the intention of this rule is to allow people to testify about personal or family facts that by their nature are just so inherently reliable that the rule doesn't concern itself whether or not the declarant is in fact available or unavailable. Because people's personal family facts are things that you likely hear from your family. That's how most of us learn about where we were born or our particular family history. And so Mr. Kelly Palmer's offered testimony that Hoppe Kelly told him he was born in National City, properly was reputation evidence, and it satisfied the rule. What the district court did, though, was say Mr. Kelly Palmer is the defendant and his testimony is inherently unreliable, and so I'm excluding the evidence. And that was basically a per se rule saying any person who's in the defendant's shoes, who's testifying about the heart of their defense, shouldn't be able to testify to this type of hearsay statement. And that's exactly what Rock v. Arkansas was about, to not apply a per se rule to a person who's in the position of a criminal defendant. The testimony was also admissible. Is it automatic reversal or is it harmless error? It is harmless error analysis, but the government has to prove that the error was harmless beyond a reasonable doubt. And in this case, because Mr. Kelly Palmer wasn't able to testify to the heart of his defense, I don't think we could say that the jury had an – the jury could have believed him. The jury could have believed that Hoppe Kelly had told him he was born in the United States, and that was reliable enough to at least come to a conclusion. In the evidence that he admitted that he had – in previous proceedings, both in immigration proceedings and in prior criminal proceedings, he admitted that he was not a United States citizen. That's correct. That evidence was in the record? Yes, Your Honor. At that point when the judge made his ruling? At the point when the judge made the ruling, yes. Yes. But he testified that he had made these false admissions of alienage under pressure to avoid incarceration. I understand that. That's correct. There was evidence in the record that Mr. Kelly Palmer had in previous immigration proceedings and in previous criminal proceedings admitted that he was an alien and not a citizen of the United States. But it says under pressure to avoid incarceration. When he was in immigration proceedings, he was held in custody. What? He was held in custody when he was in immigration proceedings. He wasn't free to come and go as he pleased. As within the criminal proceedings, he was held in custody. And Mr. Kelly Palmer's testimony regarding his previous admissions was basically if I admit that I'm Mexican, if I say that I'm not a U.S. citizen, and because I don't have any documents, I don't have any proof to show anybody, that if I admit that I'm Mexican, I go home faster. I can leave. And so that was his testimony, that when he was in immigration proceedings and when he was offered plea deals in prior immigration-related criminal cases, because he lacked any type of physical proof of his citizenship, it was easier for him to say. Well, where did he grow up? Mr. Kelly Palmer testified he grew up in Nayarit, Mexico. Where? In Nayarit. My family? Nayarit, N-A-Y-A-R-I-T, Mexico. Okay. He testified that he grew up there and that he was raised by a woman who wasn't related to him. He was essentially adopted. He didn't learn the true facts about his birth until he was 15 years old. And he testified at that time that Papa Kelly came to Nayarit and brought him to the United States, and he stayed with Papa Kelly for two years or, sorry, two months on Papa Kelly's ranch that was in the Cuyamaca area in Southern California. Where? In the Cuyamaca Mountains in Southern California. And what happened to Papa Kelly? Mr. Kelly Palmer testified that he believed Papa Kelly was dead. Based on the fact that he had been back to the ranch and found that the ranch was abandoned. Papa Kelly was dead. I would agree that just the fact that the ranch was abandoned. But Mr. Kelly returned to the ranch. What he said was it was abandoned, so not just there were people living there where Papa Kelly wasn't there, but just that it was flat-out abandoned. And Papa Kelly also was, you know, an elderly man. Was what? At this point, Papa Kelly was also elderly, and so I think. How old was he? Well, from the record, what we can determine is that Mr. Kelly Palmer is somewhere between his mid- to late-40s. And if you reconstructed his family history very generously and assumed that his grandfather had children at 15 or 16, and that Mr. Kelly Palmer's father had Mr. Kelly Palmer when he was 15 or 16, at that point, Papa Kelly is in his 80s at some point. And so it's not an unreasonable inference from Mr. Kelly Palmer's testimony that Papa Kelly is in fact deceased. Did you conduct any investigations to see if you could locate Papa Kelly? Yes. Were you at the council at trial? Yes. So what? We didn't present any evidence about the investigation. What? We didn't present any evidence about the investigation that we had conducted. Say that again? We did not present any evidence at trial, so it's not in the record what the investigation was that we. . . I'm just asking you, did you conduct an investigation trying to find him? Yes. What did you do? Well, we tried to go to the ranch. We did find that the ranch. . . Okay, he's not at the ranch. So what else did you do? We also did people searches. We looked for him the best we could, but we just couldn't. You did what? We did people searches. We did Internet searches for the name Thomas Kelly. We didn't find anybody who matched the age range that we were looking for. So we didn't find Papa Kelly. But Mr. Kelly Palmer also. . . I gather in his prior criminal proceedings, as we were talking about a minute ago, in the other case, he stood up there in front of the judge, his advice of counsel, and admitted that he wasn't a United States citizen, right? That's correct. He did that. What's important here, though, is that Mr. Kelly Palmer was essentially testifying. I said those things in the past, that's true, but that's not what I believe. I believe I was born in National City, and this is my evidence of it. My evidence is that my grandfather told me I was born in National City, and I don't have any other proof, just what my grandfather told me, which I think a lot of people would find reliable. Do you think in those prior criminal proceedings, if he had said, Judge, I don't think I'm a. . . I think I'm a United States citizen, do you think the judge would have taken his pleas in any of those cases where it was essential that the government prove alienage? No. Right. Having said that, his past statements weren't relevant to the determination of whether the testimony he was proffering in this trial was admissible, and that's, I believe, what the district court did wrong in this case. Well, I might give you. . . You know, I'm not sure how I come out on that, but even if I were to give you that, I'm still concerned about, you know, what's the consequences of it. Is it harmless or not? I don't think that it's harmless because Mr. Kelly. . .  ultimately didn't get to pass on all of the important evidence in the case, and ultimately Mr. Kelly Palmer was denied his right to a jury trial because they weren't able to hear the most important part of his defense because the judge made the credibility determination that was solely in the province of the jury to find that it in fact. . . I'm sorry, I'm going too fast. Because the judge made the credibility determination in advance and didn't allow the jury then to hear the most important evidence that the judge essentially took from the jury the ability to make that credibility determination to decide whether Mr. Kelly Palmer was telling the truth or not, and that denied him a right to a jury trial, which was structural error. On the issue of the Sixth Amendment denial of the right to testify and to present a defense, it is the standard of harmless beyond a reasonable doubt, which is the government's burden to prove. The jury absolutely could have chosen to credit Mr. Kelly Palmer's statements. They could have. . . He explained why he had in the past lied about his alienage, and he explained what his only evidence was in his defense in this case, and the jury didn't get to hear that evidence, so I don't think we could say that it's harmless beyond a reasonable doubt. The jury could have made the determination that there's at least a reasonable doubt about where this person was born. Well, did you check to see if there was a death certificate in the county on Papa Kelly? My understanding of what our investigator did was check, basically doing Westline. We did public records checks looking for Thomas Kelly. What we didn't find were any records for a person that fit the age description that we were looking for. What was destroyed? Nothing was destroyed. We didn't find any records of Thomas Kelly. Was Papa Kelly born there? We don't know. We don't know. Well, did you check the birth records? We checked the public records, yes. Well, I mean, did you go to the police and say there's a missing person here, and they could check to see if he was still receiving, you know, Social Security? No. Well, so you didn't make much of a search. I mean, people just don't vanish. Certainly people don't vanish, but we weren't able to find, to track down Thomas Kelly. The fact that Papa Kelly was unavailable or that Mr. Kelly Palmer believed he's deceased, and I think that Mr. Kelly Palmer's testimony was sufficient to show that Papa Kelly was unavailable or deceased. Well, what was Papa Kelly's true name? Thomas Kelly. What? Thomas Kelly. No middle initial? We didn't know if there was a middle initial. So it's Thomas Kelly. I'm sorry. You can. Okay. And I think those were all questions that the prosecutor certainly could have asked Mr. Kelly on cross-examination. His testimony wasn't so immune. We've gone through all this, and you're way beyond your time. Thank you, Your Honor. All right. May it please the Court. Stuart Young with the United States, the appellee. I'm under the assumption we won't talk about the expert testimony issue, and I'll just kind of delve right into the hearsay issues. In terms of there were two. Do you know anything about this? Was it Thomas Kelly? Did I know anything about this? Did you know anything about it? Not until the middle of trial, Your Honor. I had repeatedly asked for any reciprocal discovery that was going to be provided, and that's defendant's right not to provide that. However, during opening, it was alluded to that there was this person, that this person came to Mr. Kelly Palmer and told him these things. That was the first I'd heard of it. We then went through our trial, and after I rested, given that I still was unsure what the testimony was precisely going to be, I briefed to the Court kind of a pocket brief on 80319 and on 804B4B in terms of what it appeared to me would be kind of the structure as to what would be competent evidence and what would not be competent evidence that should be provided to the jury. And it wasn't until the next day when Ms. Pelequin and Ms. Betancourt, her co-counselor, were going to begin their provision of the evidence did I fully understand who Papa Kelly was, who this person was. So I was not provided any of that information beforehand. In fact, most of the pretrial litigation was over the expert witness issue, and this was the Papa Kelly or Thomas Kelly. Did your office check to see whether such a person existed? Your Honor, we did go to the county records office to determine part of Mr. Kelly's story, which was that he had been born in National City. And we went there and tried all of his names in different orders and so forth to determine whether he had been born in National City from January 1st, 1900 to, I believe, January of 2008. And there were no records on that. As to Thomas Kelly, we did not do that determination, given that I had no knowledge until the middle of trial what was going on. So but in terms of that, I think that burden of ---- If you couldn't do it, you'd probably get the FBI to do it. You're correct. We could probably get the FBI to do it, Your Honor. But given there's no other identifiers, there's no Social Security number, there's no middle initial, I asked for any location where Papa Kelly ---- Do you know where he lived? No, I don't. I still have yet to get any information. Apparently, they've been to that place. But I was not provided any of that information. So it's difficult for the United States ---- If you had his name and you knew where he lived, you could get the information. Well, now ---- That might have helped. Am I right in understanding the defendant says, my grandfather told me? And you object to that? Isn't he allowed to testify about family history? The jury can believe it or not. Why should the judge decide it? In terms of 804b-4, if he's going to get in through that, then the declarant, who is Papa Kelly, has to be unavailable. And it's pretty clear, the court went through an analysis and said, well, how do we know he's unavailable? And in the record, it's very clear that Kelly Palmer says, I went to the ranch and he wasn't there. That's it. There's no other determination. Wouldn't he have been pretty old? My grandmother's 91, Your Honor. I mean, if we're talking about 80s, I don't know. I mean, yes, he probably would have been pretty old. But clearly, you have to demonstrate some indicia of reliability as to whether he is unavailable or not. Just because. That's what your thinking point is. They didn't show he was unavailable. Well, that's as to 804b-4, Your Honor. As to 803-19, which is another essential exception to the hearsay rule, it's clear, especially from the advisory committee notes, that trustworthiness is important in terms of reputation for birth, marriage, death, those types of things in the community. And in terms of what type of evidence we had that Thomas Kelly even existed, none provided. I asked for it. I requested it. I requested reciprocal discovery. Never provided. The only indicia of any reliability comes from Kelly Palmer himself, a person who's been convicted in 98, 99, 2002, 2004, sometimes for false statements to a federal officer, sometimes for 1326 prosecutions, which is exactly what this is. In addition, any proffer made by Kelly Palmer as to what his grandfather told him was severely lacking. He didn't explain, well, you know, he told me this while I was living with him on this date. He explained the circumstances of my birth. Mr. Kelly Palmer didn't even know the names of his parents, which would be the son of Papa Kelly. You would think that if Papa Kelly's actually talking about Mr. Kelly Palmer's birth, he would have also mentioned the names of his parents. We don't have that. It was very clear that this lacked any type of indicia of reliability. And as the Advisory Committee notes, no, and as the Blackburn case, which is a Third Circuit, and unfortunately there's not any published opinions in the Ninth Circuit on this precise issue. But the Blackburn case specifically looked at 803.19 and talked about this trustworthiness, talked about these indicias of reliability. Now, Appellant talks about how this was a violation of Sixth Amendment rights. The sky isn't falling here. Clearly, the district court, as the gatekeeper of competent evidence that should be provided to the jury, made a proper determination. It had a very long discussion. It's in the record from about 255 to 274, all about these two rules. And the district court judge didn't just come out and say, look, I disbelieve Mr. Kelly Palmer. She said there's got to be some indicia of reliability, some indicia of trustworthiness to allow this to go back to the jury. Let me ask you, I just have a couple of questions. So how do we determine whether, well, the claim is that the Court used the rules of evidence to exclude this key evidence that was essential to his defense, right? And she said, well, that rose to a constitutional violation. How do we determine that? Well, Your Honor, Illinois v. Taylor makes it very clear that the rules of evidence apply to everybody, and that's not necessarily a constitutional violation if we have evidence of fault. But you would in the case law just recognize that a trial court judge could use, could make an evidentiary ruling that was so severe that it rises to a constitutional violation, correct? Yes, correct, Your Honor. Okay. Does that happen here? Not at all. Why not? And let me explain why. We had mountains of evidence about what the defendant had done.  He's got charred clothes because he's come through right after the big fires that were down in San Diego. When he sees the Border Patrol agent, he freezes, you know, very clear evidence that he's not supposed to be here. We had the A-file custodian testify as to all the A-file documents, indicating that he was not a U.S. citizen, that he'd been deported numerous times, and that he did not have permission to come back into the United States. We had the fingerprints on all the documents, and very clear. So it looks like the government had a strong case. Yes, Your Honor. Does that mean he doesn't have, he's not able to raise an affirmative defense of citizenship? Yes, he is able to raise this defense, but it has to be based on competent evidence, Your Honor. If we're going to willy-nilly just decide that we're not going to follow the rules of evidence, that is a concern. And in this type of case, defendant had to provide something more. That's it. Something more. And that was not provided here. So let me say, let me ask you this. If it rises to a constitutional violation, is it an automatic reversal? No, I think it would be subject to harmless error analysis, and it's clear that there was not harmless error here. In fact, the defendant was able to testify that I believe I was born in the United States. He was able to testify, you know, I decided to make all of these false admissions to the federal government, both in criminal proceedings and deportation proceedings, because I wanted to get out of custody. He was able to get all of this except for these essentially double hearsay statements. Because even if you look at 803.19, there's still another leap that needs to be made. If Papa Kelly, Thomas Kelly, had come and testified himself, and he had said, look, I'm a real person, first of all, because we're not even sure about that. But I'm a real person, and here are the parents of Kelly Palmer and so forth. I wasn't at the birth, but we talked about it around when we have eggnog at Christmas every year. That's what 803.19 is all about. This was another jump, because the statements were actually made to Kelly Palmer, so Kelly Palmer was its essentially double hearsay now. So I hope that answers that question. I see my time is up, unless there are any other questions from the Court. Thank you very much. We'll give you a minute to rebut. Thank you. Government counsel indicated that the district court only made a ruling about unreliability. But I just wanted to quote to the court, and it's at excerpts of record, page 275. The district court said, I don't even think this person exists, and it's inherently unreliable. There's no indicia of reliability or trustworthiness as to whether this person ever existed, and number two, whether he even made those statements and whether he's unavailable. And the defendant's testimony that he knows he's dead is not sufficient. I think what government counsel is doing is making the same error that the district court made, which is making the credibility determination about Mr. Kelly Palmer in advance. The government certainly had all kinds of cross-examination tools available to them and other evidence that they could have used to argue to the jury that Mr. Kelly Palmer wasn't telling the truth or was mistaken, but that's not what happened in this case. He wasn't able to present the heart of his defense, and that's what the constitutional violation is. He should have been able to present that evidence, and then the government could impeach him with his other statements or show that no other evidence existed of his birth in the United States, and then the jury can decide. Yeah. Let me ask you this one question. Did you ever go to the post office that, well, that's not funny. That's the first place to go to, huh? You ever go to the post office and ask the mailman or the mailwoman or the mailperson, if they delivered mail to Thomas Kelly? Your Honor, I can only tell you that we looked for Thomas Kelly. Did you call? All you've got to do is get on the phone, call the superintendent of mails at the post office that's within the post office that services where Kelly left, and ask to talk to the postal person who delivered mail to that ranch. See? And then they'll put someone on the line, and you can ask them, did you know Papa Kelly? Yeah. Well, when did you last deliver mail to that address? They'll tell you that, too. And do you know what happened to him? Yeah, probably died. How do you know that? Well, I was there delivering mail, and there were people at the house, and I inquired, and they said they'd just come back from the cemetery. Or he kept getting mail, kept getting mail, kept getting mail. He got Social Security checks that were just left in the box, and we sent them back to Social Security. I mean, they can tell you a lot. I would agree with that, Your Honor. So that's your problem. That's your problem. You have him saying, well, I lied because it was as long as I tell him that I'm Mexican, they just kick me back to the border. And that's a lot better than going to prison. I don't know what was going through his mind on that. I would agree, Your Honor, but I think at the end it's the jury that makes that determination, and certainly the government had Mr. Kelly Palmer's prior sworn statements to impeach him with, and there's no question the government would have and, in fact, did that in the case. I understand. Okay. Thanks. That is the matter.
judges: Pregerson, Noonan, Paez